# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LUCRETIA PULOS, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) Civil Action No. 09-142 Erie ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

      Plaintiff, Lucretia Pulos ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*, and § 1381 *et seq*. Plaintiff filed applications for DIB and SSI on March 4, 2005, alleging disability since February 10, 2001 due to obsessive compulsive disorder, depression, asthma, back and knee pain and endometriosis (Administrative Record, hereinafter "AR", 68-70; 94).[1] Her applications were denied and she requested a hearing before an administrative law judge ("ALJ") (AR 59-64). A hearing was held before an administrative law judge ("ALJ") on May 27, 2007 and following this hearing, the ALJ concluded that the Plaintiff was not entitled to a period of disability, DIB or SSI under the Act (AR 12-20). Her request for review by the Appeals Council was denied (AR 4-7), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, the Defendant's motion will be denied and the Plaintiff's motion will be granted only to the extent she seeks a remand for

---

[1]Plaintiff previously filed applications for DIB and SSI on February 23, 1993 which were denied at the Agency level on October 13, 1993 (AR 12). She filed applications again on October 24, 2002 which were denied on March 12, 2003 (AR 12). Plaintiff did not appeal these denials (AR 12).

1

further consideration.

# I. BACKGROUND

Plaintiff was thirty-three years old on the date of the ALJ's decision (AR 91). She is a high school graduate but attended special education classes while in high school (AR 100). She has past relevant work experience as a home health care attendant and fast food cashier (AR 102).

Plaintiff was seen on July 25, 2003 at Community Integration, Inc. for medication management and was reportedly working three jobs at that time (AR 224).[2] Plaintiff further indicated that she was "doing well," her moods were more stable and she denied any suicidal thoughts (AR 224). On mental status examination, her mood, affect and cognition were reported as normal, and she was pleasant and cooperative (AR 224). She was assessed with a Global Assessment of Functioning ("GAF") score of 55 (AR 165).[3]

Plaintiff presented to Millcreek Community Hospital on August 15, 2003 complaining of suicidal thoughts related to child custody issues, health problems and a recent rape (AR 152-155). She was transferred to the Stairways, Inc. residential unit where she spent three days undergoing counseling and was prescribed Zoloft (AR 155-160). She was subsequently discharged on August 18, 2003 in stable condition free of suicidal thoughts (AR 155).

Community Integration medication progress notes dated September 11, 2003 show that the Plaintiff complained of anxiety and depression on that date (AR 223). On mental status examination, her mood was depressed, her affect was anxious and she denied any suicidal thoughts (AR 223). She was assigned a GAF score of 50 and her medication regimen stayed the

---

[2]Plaintiff does not challenge the ALJ's decision with respect to her alleged physical impairments. Therefore, the Court's discussion will be limited to the evidence relative to the Plaintiff's alleged mental impairments.

[3]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. It represents "the clinician's judgment of the individual's overall level of functioning." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 32 (4th ed. 2000). Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id*. at 34.

2

same (AR 223).[4]

On November 18, 2003, Plaintiff reported to Community Integration that she was recently promoted at work (AR 222). Her mood and affect were reported as normal and she was pleasant and cooperative (AR 222). Plaintiff had no acute complaints and it was noted she was "doing well" on Zoloft (AR 222). She was assessed a GAF score of 55 (AR 222).

When seen on April 12, 2004, Plaintiff requested a psychiatric evaluation (AR 221). It was noted that she had no acute depressive symptoms, but "admit[ted]" to unspecified obsessive compulsive behavior (AR 221). Her mood, affect and behavior were all within normal limits, yet she was assessed a GAF score of 50 (AR 221).

Plaintiff subsequently underwent a psychiatric evaluation on April 28, 2004 conducted by Jaime Ayala, M.D. at Safe Harbor Behavioral Health (AR 219-220). Dr. Ayala noted that the Plaintiff had been diagnosed with major depressive disorder, recurrent (AR 219). It was further noted that the Plaintiff had attended individual and group therapy sessions in earlier years but became "disenchanted" with those services (AR 219). Dr. Ayala indicated that the Plaintiff was quite active with both of her children who were doing very well in school, and also assisted her sister with one of her children (AR 219). Plaintiff stated that she was not able to work beyond 15 hours per week because she lacked daycare services for her children (AR 219). Dr. Ayala reported that the Plaintiff managed to do well despite her depressive outlook of a "dysthymic nature" (AR 219).

In Dr. Ayala's mental status examination of the Plaintiff, he noted that she was dysphoric[5] and preoccupied with ensuring an adequate support system for her children (AR 219). She denied suffering from any sleep disorder or having suicidal thoughts (AR 219). She acknowledged irritability and at times being short-tempered with her children, but recognized this as a sign of stress (AR 219). Dr. Ayala reported that the Plaintiff appeared "motivated for

---

[4]Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. at 34.

[5]"Dysphoria" is a "mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort." *Stedmman's Medical Dictionary* at 116700 (27th ed. 2000).

3

vocational rehabilitation" (AR 219). He diagnosed the Plaintiff with "[m]ajor [d]epression, recurrent, in partial remission, [r]ule out [d]ysthymic [d]isorder," and assigned her a GAF score of 50 (AR 220). Dr. Ayala recommended that her medications remain at the same level and that she consider a referral to vocational rehabilitation (AR 220). He characterized her prognosis as "favorable" (AR 220).

When seen for medication management on July 12, 2004, the Plaintiff was pleasant and cooperative, and her mood, affect and cognition were within normal limits (AR 218). It was noted that she was doing well on Zoloft and she was assessed a GAF score of 55 (AR 218).

On October 12, 2004, Plaintiff reported that her depression continued and she was currently homeless but staying with friends (AR 217). It was noted that she was pleasant and cooperative and exhibited a "good attitude" (AR 217). Her mood, affect and cognition were within normal limits (AR 217). No acute psychotic or depressive state was observed or reported, and the Plaintiff was stable with a GAF score of 50 (AR 217). She was encouraged to stay on her medication and return for follow up in three months (AR 217).

When seen at Safe Harbor Behavioral Health on January 5, 2005, Plaintiff reported that she was "overwhelmed" and homeless, and complained of increased depression, anxiety and confusion (AR 216). She further reported she was in a shelter with no income and was unable to work (AR 216). Her mood was reported as depressed, she exhibited an anxious affect and displayed evidence of "thought blocking"[6] (AR 216). She was assessed a GAF score of 45 and encouraged to apply for temporary disability (AR 216).

When she returned on February 24, 2005, Plaintiff presented as depressed, anxious and irritable but there was no evidence of thought blocking (AR 215). She continued to complain of depression and was distressed about her current living situation (AR 215). Plaintiff reported increased mood swings, but denied suffering from any suicidal or homicidal thoughts (AR 215). Her Zoloft dosage was decreased, Wellbutrin was added for depression and Topamax for mood stability (AR 215). She was assessed with a GAF score of 45 to 50 (AR 215).

---

[6]"Thought blocking" occurs "when a person stops speaking abruptly in the middle of a thought." http://www.nimh.nih.gov/health/publications/schizophrenia/complete-index.shtml (last visited June 7, 2010).

On April 20, 2005, Plaintiff underwent a psychological evaluation performed by Isis Kuczaj, Clinical Psychology Intern, at Saint Vincent Outpatient Behavioral Services, who noted that the Plaintiff began treatment at the facility in February 2005 for depression and a "lying disorder" (AR 229). Plaintiff reportedly told a friend she had cancer and was undergoing chemotherapy in order to induce the friend to offer her a place to stay (AR 236). She indicated that her dishonesty had "gotten her into trouble" almost causing her to lose custody of her children (AR 229). Ms. Kuczaj reported that the Plaintiff was pleasant and cooperative and her thought processes were "connected and organized" (AR 230). Ms. Kuczaj noted that the Plaintiff showed "few signs of remorse" for her actions (AR 230).

Ms. Kuczaj administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), and concluded that the results were invalid because, in her view, the Plaintiff answered items in such a way as to present herself with severe psychopathology (AR 230). She noted that the Plaintiff's production of a "fake-bad" MMPI-2 profile was consistent with her compulsive lying problem (AR 230). Ms. Kuczaj found that the Plaintiff's problems would be difficult to address in treatment because the Plaintiff felt compelled to exaggerate her condition to therapists (AR 230). Due to the production of what she considered to be an invalid profile, Ms. Kuczaj did not render a diagnostic impression (AR 230).

On May 23, 2005, Gloria Kieffer, M.A., a psychologist at Saint Vincent, reported that the Plaintiff had been in outpatient counseling since January 2005 for depression and by the Plaintiff's definition, a "lying disorder" (AR 232). According to Ms. Kieffer, the Plaintiff seemed remorseful for her pattern of dishonesty and its consequences (AR 232). It was noted that the Plaintiff had a documented history of extensive childhood abuse and numerous foster placements (AR 232). Ms. Kieffer reported that the Plaintiff's treatment had been sporadic with "very inconsistent involvement" and that she had only kept 9 out of 16 scheduled appointments (AR 232). She indicated that the Plaintiff was a poor candidate for ongoing treatment due to her non-compliance with Saint Vincent's "no show" policy (AR 232). Ms. Kieffer diagnosed the Plaintiff with major depressive disorder, in partial remission, post traumatic stress disorder and personality disorder, not otherwise specified (AR 232). She assigned her a GAF score of 60 (AR 232).

On July 8, 2005, Ray Milke, Ph.D., a state agency reviewing psychologist, completed a Mental Residual Functional Capacity Assessment form, and found that the Plaintiff was not significantly limited in a number of areas, but was moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and maintain punctuality; and complete a normal workday/workweek without interruptions from psychologically based symptoms (AR 279-280). Dr. Milke also concluded that she was moderately limited in her ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others (AR 280).

Dr. Milke found that the Plaintiff could perform simple, routine, repetitive work in a stable environment and remained capable of understanding and remembering instructions, concentrating, interacting appropriately with people and adapting to changing activities within the workplace (AR 281). He noted that she had a low frustration tolerance with a history of impulsive and distractive behavior, but could work within a schedule and at a consistent pace (AR 281). He further found she could function in production oriented jobs requiring independent decision-making (AR 281). Dr. Milke indicated that the Plaintiff's limitations in all areas were significant, "but not so severe as to preclude performance of routine work tasks" (AR 281). Dr. Milke relied, in part, on a report prepared by Ramin Sassani, D.O., who performed a consultative physical evaluation of the Plaintiff on June 2, 2005 (AR 258-265). With respect to her depression, Dr. Sassani observed:

> Depression, currently controlled with current medications. The patient is seeing Dr. Sue at the State Behavioral Health. The obsessive-compulsive disorder is continuous. It does not seem to be disabling to the patient. She is able to function normally in society.

(AR 261). Dr. Milke concluded that the Plaintiff could "meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments" (AR 281).

On December 16, 2005, Plaintiff was psychiatrically evaluated by Matthew Sipple, D.O.

6

at Stairways Behavioral Health Outpatient Clinic (AR 315-318). Plaintiff reported a history of sexual abuse as a child and physical abuse as an adult (AR 316). She relayed her history of mental health treatment, stating that she left Safe Harbor because she was dissatisfied with her treatment (AR 316). She reported a history of depression, difficulty sleeping, guilt over traumatic experiences in her past, irritability, racing thoughts and rapid mood changes (AR 315). Plaintiff further reported multiple stressors, including problems with her landlord (AR 315).

On mental status examination, Dr. Sipple reported that the Plaintiff was appropriately dressed and alert with normal speech (AR 317). Her affect was restricted and at times tearful (AR 317). Her thought process was organized and relevant, but her thought content was "positive for guilt" (AR 317). Her short and long-term memory were intact, and her insight and judgment were fair (AR 317). Dr. Sipple diagnosed her with a "[m]ood disorder not otherwise specified[,] [p]osttraumatic stress disorder[,] [g]eneralized anxiety disorder[,] [r]ule out bipolar disorder[,] [and] [r]ule out dysthymia" (AR 317). He assigned her a GAF score of 50 and continued her medication regimen (AR 318). Plaintiff refused to attend group therapy, but agreed to follow up with individual therapy to address her multiple psychosocial stressors (AR 318).

On February 24, 2006, Stairways Outpatient progress notes reflect that the Plaintiff was at the Crisis Residential Unit for five days from February 13, 2006 to February 17, 2006 (AR 308). She reported being "stressed out" (AR 308). She indicated she had sleep problems, as well as decreased energy (AR 308). Her affect and mood were reported as depressed and she claimed to have suicidal thoughts (AR 308). Her Zoloft and Wellbutrin dosages were increased and she was instructed to go to the hospital if her suicidal thoughts increased (AR 308).

On May 10, 2006, Plaintiff reported decreased sleep and increased irritability (AR 306). Dr. Sipple reported that her mood and affect were depressed and she was irritable (AR 306). She denied suffering from any suicidal/homicidal thoughts and denied having any delusions or hallucinations (AR 306). She exhibited a logical thought process (AR 306). Dr. Sipple increased her Zoloft dosage and continued her on Wellbutrin (AR 306).

When seen by Dr. Sipple on October 4, 2006, Plaintiff reportedly felt better and was less depressed (AR 305). There were no reported problems with sleep or her appetite, and Dr. Sipple

found her affect was euthymic and her mood was "ok" (AR 305). She denied any suicidal or homicidal thoughts and had no illusions, delusions or hallucinations (AR 305). He found she was tolerating her medications "well" and increased her Zoloft dosage (AR 305).

Plaintiff telephoned Stairways on December 13, 2006 complaining of increased depression and "severe flashbacks" (AR 304). She claimed she had called "crisis" five times and was scheduled to begin classes at the Crime Victim Center ("CVC") on December 15, 2006 (AR 304). Plaintiff refused an appointment, but was instructed by the nurse to go to the emergency room if her symptoms increased (AR 304).

On January 5, 2007, Plaintiff was seen by Dr. Sipple and reported multiple psychosocial stressors (AR 304). Dr. Sipple reported that her mood was depressed but her affect was slightly improved (AR 304). She had no suicidal/homicidal thoughts and denied suffering from any delusions, illusions or hallucinations (AR 304). Her Zoloft was increased and she was advised to continue therapy (AR 304).

Plaintiff was seen by Dr. Sipple, along with her intensive case manager, on April 2, 2007 (AR 303). Plaintiff claimed she had been sexually assaulted by her ex-boyfriend (AR 303). She reportedly filed charges and was undergoing counseling at CVC (AR 303). Dr. Sipple reported that her affect was tearful, she was depressed and she had passive suicidal thoughts (AR 303). Her Zoloft dosage was increased and she was instructed to contact "crisis" or go to the hospital if her symptoms worsened (AR 303).

Finally, on April 18, 2007, Dr. Sipple completed a form entitled "Mental Abilities and Aptitudes Needed to do Unskilled Work" and opined that the Plaintiff could not: (1) maintain attention for extended periods; (2) maintain regular attendance and be punctual; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or proximity to others without being distracted; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace; (6) accept instructions from supervisors and respond appropriately to criticism; and (7) get along with co-workers or peers without (unduly) distracting them or exhibiting behavioral extremes (AR 314). Dr. Sipple indicated that his assessment of the Plaintiff was based upon "mental status examinations, observation of the patient, clinical history and/or review of symptoms/signs" (AR 314).

Plaintiff testified at the administrative hearing that she lived with her two children ages twelve and nine (AR 28-29). She claimed an inability to work because she was "very nervous around other people" and had an aversion to being "yelled at" (AR 32-33). Plaintiff admitted that she falsely claimed to have cancer so that a friend would offer her a place to live (AR 33-34).

With regard to her symptoms caused by her mental health impairments, the Plaintiff testified that she had more bad days than good (AR 41). She indicated she frequently cried, did not leave her home and had concentration problems (AR 41-42). She also claimed that she was unable to continue working at Arby's because she could not tolerate "stress from other people" (AR 42). She recounted a history of frequent nightmares relating to her past history of abuse (AR 43). Plaintiff stated that on a typical day she cared for her children, attended appointments and cleaned her house (AR 44). She also reported that she maintained a journal as suggested by her psychiatrist, watched television, helped her children with their homework and prepared meals (AR 44).

Cassie Mierke, from Case Management Support Services, testified that she had been the Plaintiff's mental health intensive case manager since March 28, 2005 upon referral by Safe Harbor Behavioral Health (AR 46-47). Ms. Mierke stated that she had a Bachelors degree in Criminal Justice and over fourteen years experience working with individuals with mental health disorders (AR 49). She testified that in order for an individual to qualify for support services, such individual must have a diagnosis of a serious mental illness with a GAF score of 60 or below (AR 47). She stated that she had contact with the Plaintiff at least once per week and sometimes more if the Plaintiff felt overwhelmed or needed assistance accessing community resources (AR 47). Ms. Mierke had frequent phone contact with the Plaintiff and saw her physically two to three times per month depending upon her needs (AR 47). She testified that currently she was in the process of assisting the Plaintiff deal with the sexual assault she had endured (AR 47). Ms. Mierke indicated that the Plaintiff would not consistently attend her therapy appointments without encouragement (AR 48).

Ms. Mierke characterized the Plaintiff's emotional state as "fragile" and stated that she had difficulty working through every day problems (AR 48). For instance, Ms. Mierke indicated that the Plaintiff had difficulty keeping track of appointments and completing applications for

9

financial programs in the community (48). Ms. Mierke was of the opinion that the Plaintiff could not "consistently" maintain attendance or "handle" a job, and would be unable to focus and concentrate on the task at hand (AR 49). Ms. Mierke stated that she was aware of the Plaintiff's fabrication relative to her physical health, but that the Plaintiff acknowledged that her conduct was "very wrong" (AR 49).

The ALJ asked Nancy Harter, the vocational expert, to assume an individual of the same age, education and work experience as the Plaintiff, who was able to perform light exertional work, and who was further limited to simple one- or two-step tasks not involving frequent contact with the public, supervisors or co-workers (AR54). The vocational expert testified that such an individual could perform her past relevant work as a home health aid (AR 54).

Following the hearing, the ALJ issued a written decision finding that the Plaintiff was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 12-20). Her request for an appeal with the Appeals Council was denied and she subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A

person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through March 31, 2009 (AR 12). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ resolved the Plaintiff's case at the fourth step. The ALJ found that, *inter alia*, the Plaintiff's depression and anxiety were severe impairments, but determined at step three that she did not meet a listing (AR 15-18). The ALJ further found she had the residual functional capacity ("RFC") to perform light work involving simple one- or two-step tasks not entailing frequent contact with the public, supervisors or co-workers (AR 18). The ALJ concluded that her past relevant work as a home health attendant did not require the performance of work-related activities precluded by the above limitations (AR 20). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff argues that the ALJ erred in various particulars relative to her assessment of her mental impairments. Specifically, the Plaintiff claims that the ALJ lacked a sufficient basis to reject the opinion of her treating psychiatrist, Dr. Sipple, and that she erred in affording "scant weight" to the testimony of Ms. Mierke solely on the basis that she was a "layperson." She also argues that the ALJ failed to address evidence pertaining to an alleged intellectual impairment.[7]

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3rd Cir. 2000) (quoting *Plummer v. Apfel,* 186 F.3d 422, 429 (3rd Cir. 1999)). Where the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may chose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3rd Cir. 1993)). The ALJ must consider the medical findings that support a treating

---

[7]This argument can be dispensed with in short order. Plaintiff argues that the ALJ failed to address evidence pertaining to her alleged intellectual impairment. *See* Plaintiff's Brief pp. 20-21. Plaintiff submitted to the Appeals Council a report from the Northwest Tri-County Intermediate Unit dated March 2, 1992, showing her scores on the Weschler Intelligence Scale for Children-Revised reflected a Verbal IQ of 68, a Performance IQ of 106, and a Full Scale IQ of 85 (AR 336). This report, however was not included in the list of exhibits considered by the ALJ in evaluating her claim. Because this exhibit was not considered by the ALJ, I cannot consider this record in my substantial evidence review of the ALJ's decision. *See Matthews v. Apfel*, 239 F.3d 589 (3rd Cir. 2001). *Matthews* held that in order to qualify for a remand option, three requirements must be satisfied: (1) the additional evidence must be "new"; (2) it must be "material" to determination of the claimant's disability benefits claim; and (3) there must be "good cause" for the claimant's failure to present the new evidence in a prior proceeding. *Matthews*, 239 F.3d at 593 ("[W]hen [a] claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ.").

Here, I find that the Plaintiff has failed to demonstrate that remand is warranted for the ALJ to consider this evidence. First, this report is not "new" since it was clearly in existence or available to the Plaintiff at the time of the administrative hearing on May 24, 2007. *See Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990) (evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding. ..."). Moreover, even if I were to conclude that the evidence was material, the Plaintiff has failed to demonstrate good cause for not presenting this evidence to the ALJ for consideration.

12

physician's opinion that the claimant is disabled. *See Adorno v. Shalala*, 40 F.3d 43, 48 (3rd Cir. 1994). In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988).

The ALJ rejected Dr. Sipple's opinion with respect to the Plaintiff's functional limitations because she "agree[d]" with the state agency psychologist's assessment and because she could not discern the "clinical basis for [Dr. Sipple's] opinion in *any* of the medical records" or, in what she characterized as his "cursory treatment notes" (AR 19-20) (emphasis in original). Specifically, the ALJ concluded:

> A State agency psychologist in July 2005 did not find that the claimant's mental illness disabled her (Exhibits 15F and 16F), and I agree. On the other hand, Dr. Sipple declared on April 18, 2007 that she would be unable to: maintain attention for extended periods; remember locations and work-like procedures; maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes (Exhibit 20F). Nevertheless, I fail to ascertain the clinical basis for his opinion in *any* of the medical records, let alone in his cursory treatment notes. As he has not articulated a reasonable medical justification for these serious limitations, I will not give them much weight.

(AR 19-20) (emphasis in original). Plaintiff contends that the ALJ failed to meaningfully analyze, must less mention, significant portions of the Stairways treatment notes which arguably lend clinical support for Dr. Sipple's conclusions. The sum total of the ALJ's analysis of the Stairways treatment records is as follows:

> ... The claimant has submitted records from the Stairway Clinic covering the period from November 2005 to April 2007. The claimant is listed as seeing a social worker therapist whose notes are not included. She also cancelled or failed to appear for 7 appointments. On December 16, 2005, a mental status examination by Dr. Sipple was unremarkable except for a

13

> constricted affect, tearfulness at times, and fair judgment and
> insight. He diagnosed a mood disorder, a generalized anxiety
> disorder, and a post-traumatic stress disorder. The claimant had
> recounted certain ritualistic behavior that did not bother her. She
> had alleged sexual abuse as a child and physical abuse as an adult.
> The remainder of the clinic record consists of very brief medication
> checks containing few observations. The claimant was prescribed
> increasing dosages of Zoloft (Exhibit 20F). In March 2007, she
> reported that her ex-boyfriend had sexually assaulted her in her
> sleep and that she was pressing charges (Exhibits 18F, 20F, and
> 22F). ...

(AR 17).

As to the ALJ's alleged failure to adequately consider evidence in the Stairways records supportive of Dr. Sipple's opinion, the Plaintiff states in her Brief:

> As to the actual content of the Stairways records, the ALJ
> simply ignores pertinent portions. For example, as to Dr. Sipple's
> December 16, 2005 psychiatric evaluation, the ALJ acknowledges
> that Dr. Sipple diagnosed mood disorder, post-traumatic stress
> disorder (PTSD), and generalized anxiety disorder (Tr. 17, 317) yet
> the ALJ finds that the plaintiff's severe mental health impairments
> consist of depression and anxiety only (Tr.15). As to PTSD, Dr.
> Sipple notes that the plaintiff has a long history of being a victim
> of violence and abuse–emotional, physical, and sexual (Tr. 316)
> and that she has a lot of guilt over traumatic experiences in her past
> along with nightmares about past traumatic experiences (Tr. 315).
> In addition to restricted and tearful affect, thought content is
> positive for guilt (Tr. 317). Although ignored by the ALJ, Dr.
> Sipple opined that the plaintiff's GAF is 50 (Tr. 318). A GAF
> scale of 41-50 indicates serious symptoms or "serious impairment
> in social or occupational functioning (e.g., .. unable to keep a job)"
> DSM-IV, 30-32 (4th Ed. 2000). There is no indication in the
> subsequent Stairways records that the plaintiff's GAF scale has
> risen above 50 (Tr. 303-320).
> 
> The ALJ does not even bother to review-let alone actually
> consider-any subsequent Stairways records based on the ALJ's
> contention that the "remainder of the clinic record consists of very
> brief medication checks and few observations" (Tr. 17). This is
> not only improper reasoning by the ALJ, it is also outrageous.
> Because the ALJ did not see fit to mention mental health records
> documenting treatment for a mentally ill claimant, a brief review of
> such records follows. February 24, 2006, Stairways records
> indicate that the plaintiff again was an inpatient at the Crisis
> Residential Unit (CRU) from February 13, 2006-February 17,
> 2006. There is decreased sleep, decreased energy, and decreased
> appetite. Affect and mood are depressed. There is suicidal
> ideation (SI)). (Tr. 308) (the plaintiff was previously an inpatient at
> this same unit in August 2003 (Tr. 155-160)). The dosages of
> zoloft and wellbutrin were increased and the topamax was
> continued (Tr. 308, 310). May 10, 2006 Stairways records note

>	decreased sleep and increased irritability. Affect is depressed and mood is irritable. The dosage of Zoloft was increased (Tr. 306, 310). Stairways records dated October 4, 2006 reveal that the plaintiff is less depressed. The dosage of zoloft was still increased (Tr. 305). The plaintiff was continued on wellbutrin and topomax (Tr. 309). Stairways records dated December 13, 2006 reveal that the plaintiff is having increased depression and severe flashbacks (Tr. 304). On January 5, 2007 the plaintiff was seen at Stairways with her intensive case manager. Mood was depressed. The dosage of Zoloft was increased (Tr. 304). March 20, 2007 Stairways records indicate that the plaintiff called Stairways and was very stressed because she could not find her drivers license and Medicaid card (Tr. 303). The plaintiff was seen at Stairways on April 2, 2007 along with her intensive case manager. Affect was tearful and mood was depressed. The plaintiff stated that she had been sexually assaulted. The dosage of zoloft was again increased. The plaintiff was instructed that if her condition worsens, she should contact crisis or [go to the] hospital (Tr. 303).
>	...

Plaintiff's Brief pp. 11-13.

Here, I agree with the Plaintiff that the ALJ's review of the Stairways records was selective and incomplete. While consideration of all the evidence, of course, does not mean that the ALJ must explicitly refer to each and every finding contained in a report, *see Fargnoli v. Massanari*, 247 F.3d 34, 42 (3rd Cir. 2001), an ALJ must consider the medical findings that support a treating physician's opinion. *Adorno* 40 F.3d at 48. Here, given the ALJ's failure to adequately address the import of the psychiatric records from Stairways summarized above, a remand is required under the previously described case law.

Plaintiff also argues that the ALJ improperly rejected the testimony of Ms. Mierke, her assigned intensive case manager. In affording her opinion "scant weight," the ALJ stated:

>	... Ms. Mierke testified that she has been the claimant's case manager since March 2005 and sees her 2-3 times a month. In her opinion, the claimant is fragile and cannot focus. With all due respect to the witness, her opinion is that of a layperson and, under the circumstances of this case, I will award it the scant weight to which it is entitled.

(AR 17-18). Plaintiff acknowledges that Ms. Mierke is not an "acceptable medical source," but argues that her opinion should have been considered pursuant to Social Security Ruling ("*SSR*") 06-03p, 2006 WL 2320039.

As a case manager, Ms. Mierke is considered an "other source" under 20 C.F.R. §§

15

404.1513(d)(3); 416.913(d)(3) (other sources include "[p]ublic and private social welfare agency personnel"). Social Security Ruling 06-03p clarifies how evidence from these sources should be evaluated by an ALJ. While evidence from other sources cannot establish the existence of a medically determinable impairment, such individuals are "valuable sources of evidence for assessing impairment severity and functioning." *SSR* 06-03p; 2006 WL 2329939 at *3. In evaluating this evidence, the ALJ should consider the following factors: the nature and extent of the relationship between the source and the individual; the source's qualifications; the source's area of specialty or expertise; the degree to which the source presents relevant evidence to support his or her opinion; whether the opinion is consistent with other evidence; and any other factors that tend to support or refute the opinion. *SSR* 06-03p; 2006 WL 2329939 at *5.

Here, the ALJ discounted Ms. Mierke's opinion solely on the basis that she was a "layperson" (AR 18). There is no indication that the ALJ engaged in the analysis required by *SSR* 06-03p in reaching such determination. In an analogous situation, the court in *Magno v. Astrue*, 2010 WL 322144 (W.D.Pa. 2010) observed:

> In his decision, the ALJ makes no mention of SSR 06-03p, nor does he engage in the analysis set forth therein. Instead, as discussed above, the sole explicit reason he gives for assigning Mr. Paul's opinion limited weight was that Mr. Paul was neither a psychologist nor a psychiatrist, i.e., that he was not an acceptable medical source. He does not, for example, discuss the fact that Mr. Paul had the opportunity to observe Plaintiff more frequently than any other treating mental health professional mentioned in the record. ... Likewise, he does not discuss Mr. Paul's specialty or how well the opinion was supported or explained. Accordingly, the record is insufficient to determine whether the ALJ properly weighed Mr. Paul's opinion.
>
> • • •
>
> The weight given to Mr. Paul's opinion is relevant for several reasons. First, giving more weight to his opinion could obviously impact the ALJ's RFC determination. Perhaps even more importantly, though, Mr. Paul, as noted, indicated that Plaintiff could be expected to routinely miss three or more days of work a month because of his mental impairments. ... The VE at each of the two hearings in this case testified that if Plaintiff were to routinely miss three or more days of work a month, it would preclude Plaintiff from working at any job available in the economy. ... On remand, the ALJ should specify whether he is accepting or rejecting Mr. Paul's contention regarding Plaintiff's work attendance and the basis for his decision.

> The ALJ is not required to accept Mr. Paul's opinion regarding
> Plaintiff's limitations and work attendance, but he is required to
> adequately discuss the reason for weighing it as he has. Indeed,
> SSR 06-03p makes it clear that the fact that an opinion comes from
> an acceptable medical source may be a reason for giving that
> opinion greater weight. The Court expresses no opinion as to what
> weight should ultimately be given to Mr. Paul's opinion; it
> remands so that SSR [0]6-03p can be applied in making this
> determination.

*Magno*, 2010 WL 322144 at *5-6 (footnotes omitted). A remand is similarly appropriate here. While the Regulation does not require that the ALJ specifically address each factor and recognizes that "not every factor for weighing opinion evidence will apply in every case," *SSR* 06-03p, 2006 WL 2329939 at *5, the ALJ's proffered reason for according Ms. Mierke's opinion "scant weight" was patently inadequate. The ALJ is therefore directed on remand to evaluate Ms. Mierke's opinions consistent with *SSR* 06-03p.[8]

### IV. CONCLUSION

An appropriate Order follows.

---

[8]The ALJ is directed to address on remand the Plaintiff's GAF score of 50 assessed by Dr. Sipple at Stairways. Here, unlike the medical care provider in *Gilroy v. Astrue*, 351 Fed. Appx. 714 (3rd Cir. 2009), Dr. Sipple did "express ... opinions regarding specific limitations" that explained the basis for the Plaintiff's GAF rating. *Gilroy*, 351 Fed. Appx. at 716.

17

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LUCRETIA PULOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-142 Erie |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

AND NOW, this 9th day of June, 2010, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 7] is GRANTED only to the extent she seeks a remand for further consideration by the Commissioner. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion. IT IS FURTHER ORDERED that the Defendant's Motion for Summary Judgment [Doc. No. 11] is DENIED.

The clerk is hereby directed to mark the case closed.


                                                                    s/ Sean J. McLaughlin
                                                                    United States District Judge


cm: All parties of record. ____